CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 OCT 14 PM 2: 24

DEPUTY CLERK _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CYNTHIA LYNN ORTEGA | § § | |
| v. | § | 2:13-CV-0095 |
| | § | |
| UNITED STATES OF AMERICA | § | |

# REPORT AND RECOMMENDATION TO DENY
## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Defendant Cynthia Lynn Ortega has filed with this Court a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. For the reasons set out hereafter, the undersigned United States Magistrate Judge is of the opinion defendant is not entitled to relief and recommends the motion to vacate, set aside, or correct sentence be DENIED.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2010, defendant was charged by complaint in the Northern District of Texas, Amarillo Division, with the felony offense of possession with intent to distribute 5 kilograms or more of a mixture and substance containing cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Counsel was appointed to represent defendant, and a felony indictment was filed on June 29, 2010, charging defendant in count one with conspiracy to possess with intent to distribute 5 kilograms or more of a mixture and substance containing cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and in count two with aiding and abetting possession with intent to distribute 5 kilograms or more of a mixture and substance containing cocaine.

On September 15, 2010, a jury was selected, and the presentation of evidence began on

September 16, 2010, for both defendant Ortega and co-defendant Daniel Alan Wasyl. The jury convicted both defendants of both counts. The Fifth Circuit set out the trial evidence in the appellate decision as follows:

> On May 23, 2010, Ortega and Wasyl were traveling in a 70 mile-per-hour zone eastbound on Interstate 40 in Texas towards Oklahoma City in a 2008 Chevrolet C1500 Silverado 4C pickup truck. DPS trooper Ben Dollar pulled the Chevrolet over at approximately the 100–mile marker for following too closely, less than two car lengths behind a commercial vehicle. During the traffic stop, Wasyl told Trooper Dollar that he had agreed to drive the vehicle to Oklahoma City, Oklahoma because Enrique Gomez—the owner of the vehicle and a general contractor with EG Pro Framers—had asked Wasyl to perform electrical work on houses in Oklahoma City. To the contrary, Ortega stated that she had agreed to accompany Wasyl to Phoenix, Arizona at the request of her sister, Gomez's wife. Ortega's and Wasyl's inconsistent statements—primarily the fact that they stated two very different destinations—led Trooper Dollar to request permission to search the vehicle. Wasyl consented, and Trooper Dollar drilled into a compartment located beneath the vehicle and found approximately eight kilograms of powdered cocaine and twenty grams of crack cocaine. Trooper Dollar then arrested both Ortega and Wasyl.
>
> Following the arrest, the authorities obtained a warrant to search Ortega's cellular phone. While searching Ortega's cellular phone, the authorities learned that Ortega had received, subsequent to her arrest, the following four text messages from a man who is solely identified in the record as "Mike":
>
> 1) Received on May 24, 2010 at 8:37 a.m. from Mike: "u got a 20?"
>
> 2) Received on May 24, 2010 at 10:33 a.m. from Mike: "Hey, its mike. I need to get something asap. Please get back to me."
>
> 3) Received May 24, 2010 at 6:44 p.m. from Mike: "Hey, Its Mike. Do you have a 20 for sale?"
>
> 4) Received June 7, 2010 at 5:47 p.m. from Mike: "Whats up Cynthia, Its Mike. Do you have anything?"
>
> On September 15, 2010, trial commenced. Trooper Dollar testified that he suspected that Ortega and Wasyl were transporting illegal narcotics. Trooper Dollar had noticed sprayed and "textured mud" on the vehicle that is "a common tactic used to cover up maybe a fresh panel that doesn't match perfectly underneath the vehicle to be able to camouflage this from the untrained eye" and

to disguise compartments concealing contraband. Trooper Dollar further testified that Ortega and Wasyl were nervous during the traffic stop. Ortega "displayed a very deep, erratic breathing pattern that was just very labored and deep while she was sitting still in an air-conditioned truck" and Wasyl's hands shook "uncontrollably" when he handed Trooper Dollar his license and paperwork for the vehicle. Trooper Dollar also testified that Ortega and Wasyl had offered conflicting explanations of their trip. Wasyl told Trooper Dollar that Ortega had picked him up, whereas Ortega told Trooper Dollar that Wasyl had picked her up. As further support for his suspicion that the vehicle was involved in drug trafficking, Trooper Dollar also testified that:

- "[T]he backseat has an abundant amount of food, drinks, energy drink, and a cooler in the backseat . . .. [T]his shows that these folks are interested in hard travel. They're not interested in stopping for food, dining or sightseeing. They're interested in getting from Point A to Point B and not interested in stopping for food or drink on the way."

- "When we see . . . a key to the ignition and a key to the toolbox, that is substantial to us. That tells me that that person is not trying to connect themselves to the vehicle."

- An empty glove box "doesn't look like a legitimate everyday person's glove box that I come in contact with over and over again, that the vehicle is legitimately traveling and they're legitimately using that vehicle. To me, that shows that that vehicle doesn't have a purpose of an innocent motoring public."

- An oversized air freshener "would cover any odor of any kinds of glues, epoxies, or narcotics that might exist from building a compartment or the actual narcotics themselves."

The record also contains video recordings of the traffic stop from Trooper Dollar's vehicle, and an insurance policy dated May 21, 2010—just two days prior to their arrest—that added Ortega as an insured.

The prosecution also presented evidence from three other witnesses. Carlos Perez, a task force officer with the Amarillo Police Department assigned to the United States Drug Enforcement Administration ("DEA"), testified that the text messages came from Ortega's cellular phone. Ortega and Wasyl objected. The district court applied Federal Rule of Evidence 404(b) and found that the probative value of the text messages outweighed their prejudicial effect.

Daniel Baldwin, a special agent from the DEA, testified that, based on his experience and training, Mike's text messages appeared to be soliciting a rock of

cocaine worth $20. Agent Baldwin testified that the wholesale street value of the cocaine amounted to $125,000, while the retail (sold separately) street value of the cocaine was approximately $285,000. Scott Wischnewsky, a chemist from the DEA, stated that testing of the substance found in the vehicle revealed 7.972 kilograms of powder cocaine and 20.2 grams of crack cocaine.

Ortega and Wasyl elected not to take the witness stand. During closing arguments, the attorney[s] for Ortega and Wasyl contended that they did not know that there were illegal narcotics in the vehicle. Ortega and Wasyl maintained that (1) nothing was distinctive about their demeanor when DPS arrested them, and (2) the prosecution had offered no other proof establishing that Ortega and Wasyl knew that illegal narcotics were located beneath the vehicle. Ortega further contended that the text messages from Mike, even if they related to illegal narcotics at all, concerned at most a small-time illegal narcotics transaction that had nothing to do with transporting hundreds of thousands of dollars worth of cocaine across state lines. Ultimately, after deliberating on all of the evidence, the jury found Ortega and Wasyl guilty of both counts charged in the indictment.

*United States v. Ortega*, 478 F. App'x 871, 872-74 (5th Cir. June 21, 2012).

The presentence investigation report (PSR) was filed on October 21, 2010. On December 21, 2010, the United States District Judge sentenced defendant to concurrent terms of 120 months' imprisonment with a five-year teem of supervised release. A special assessment of $200.00 was levied.

Defendant filed a notice of appeal on December 30, 2010. The Fifth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Ortega*, No. 11-10031 (5th Cir. June 21, 2012).

On May 28, 2013, defendant filed the instant motion to vacate challenging her conviction and sentence. The government filed a response in opposition to the motion to vacate on July 1, 2013. Defendant filed a reply to the government's response on August 6, 2013.

II.
DEFENDANT'S ALLEGATIONS

Defendant contends respondent is holding her in violation of the Constitution and laws of

the United States. Specifically, defendant asserts she received ineffective assistance of trial counsel, because counsel did not investigate the text messages from "Mike," counsel did not call John Mullin as a witness, counsel did not seek dismissal of biased jurors, and counsel did not seek dismissal of a juror who fell asleep during the trial. In the conclusion of the supplement/memorandum in support, defendant contends defense counsel failed to investigate and present evidence to rebut that she was traveling from Arizona to Oklahoma without intending to stop. Defendant claims she received ineffective assistance of appellate counsel, because counsel did not respond to the government's brief and did not keep defendant updated and informed about the outcome of appeal and the availability of certiorari review. Defendant also alleges she was denied a fair and impartial trial, because a DEA agent/witness sat at the prosecutor's table throughout the trial. In the conclusion of the supplement/memorandum in support, defendant asserts she did not commit the offense, the trial court erred by treating the sentencing guidelines as mandatory, and the sentence was unjust, grossly unfair, and disproportionate to the offense.

### III.
### STANDARD OF REVIEW

In its response to defendant's motion filed July 1, 2013, the government fully and accurately sets out, at pages 5-8, the appropriate standard of review for motions brought under 28 U.S.C. § 2255, as well as the limitations on such motions. These standards and limitations are applicable to this case.

### IV.
### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674

(1984), the Supreme Court established a two-part test for analyzing ineffective assistance of counsel claims. The *Strickland* test requires a prisoner to demonstrate defense counsel's performance was both deficient and prejudicial. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). An attorney's performance is considered deficient if the attorney made errors so serious he or she was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment to the United States Constitution. *Strickland*, 466 U.S. at 689. That is, counsel's performance must have fallen below the standards of reasonably competent representation as determined by the norms of the profession. A reviewing court's scrutiny of trial counsel's performance is highly deferential, with a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. at 2065.

Additionally, defendant must show counsel's deficient performance prejudiced the defense. To establish this prong, defendant must show counsel's errors were so serious as to deprive defendant of a fair trial. *Strickland*, 466 U.S. at 687. Specifically, to prove prejudice, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *United States v. Pringler*, 765 F.3d 445, 450 (5th Cir. 2014).

   .   A. Failure to investigate and present evidence of phone records

Defendant contends defense counsel did not investigate the text messages from "Mike." Defendant asserts her cell phone records would have shown defendant had not had contact with "Mike" in at least a year, so they could not have had a dealer/client relationship. Defendant argues that would have shown she was not the architect of the drug scheme. It does not appear

defendant is arguing her cell phone records would show she did not receive the texts from Mike in May and June 2010. Instead, it appears she is arguing her cell phone records would show she had no contact with Mike for at least one year prior to the May and June 2010 texts. Defendant has not submitted any phone records to support her claim.

It is not clear what defendant means by "cell phone records." If defendant is contending her cell phone would not show any texts or calls to or from Mike in at least one year prior to May 2010, then she has not provided any documentary support for her claim nor has she shown texts and calls could not have been deleted. Even if defendant is contending the cell phone company's records would show there had not been telephone contact between defendant and Mike for at least one year, that would not show they had no personal contact or contact using another cell phone. Also, even if they had not had contact in over one year prior to May 2010, the purpose for introducing the text messages into evidence was to suggest Mike knew defendant was a source of drugs. The absence of other phone calls or text messages from Mike would not have shown defendant was unaware of the drugs in the truck.

On cross-examination of a witness who testified about the text messages, defense counsel brought out that law enforcement officials did not investigate Mike and the text messages he sent to defendant. Additionally, defendant's attorney addressed the text messages in closing argument as follows:

> So what has the Government done? After the fact, they found these text messages on the phone. Now, we don't know who Mike is. We don't know exactly what this Mike was intending to convey in those messages. What they want you to believe is that Mike was looking for $20 worth of crack cocaine because, guess what, they found a little bit of crack cocaine in all of those bundles in that hidden compartment.
>
> Okay? But, again, Agent Baldwin is speculating about what this Mike is

> asking for. He doesn't know.
>
> And I'll submit to you that, even if you believe that this Mike person was looking for drugs, somebody asking about $20 worth of a drug is one heck of a leap, okay, to somebody knowingly possessing with intent to distribute a huge amount of cocaine. That's like some kid in college that smokes pot, and a friend of theirs, you know, calls them up and says, "You know, you got any pot; you got a couple of joints you can spare," and comes over and pays them ten bucks for three joints. Okay?
>
> The Government would want you to believe that, if that happened, the kid that had the $10 worth of pot would be willing to drive cross country with a huge amount of marijuana or some other drug in the vehicle. That's exactly the conclusion that they want you to reach. And I'm telling you, if you follow the Court's instructions, you simply cannot get there.
>
> The other thing -- well, and plus they went through all of their phones. They testified to that. Don't you know that if they had found a whole lot of excessive calls, we would have heard about that, because they would have tried to make the implication that that somehow makes Cynthia Ortega a drug dealer. We didn't hear anything like that. What we have is these three text messages from Mike on one day and then another call from him a week later. Okay? So that does not indicate that we have someone receiving messages that's actively involved in selling drugs, or she would have a heck of a lot more phone calls than that.

Defense counsel argued to the jury that if there had been more phone calls or messages similar to the four messages from Mike, the government would have introduced them into evidence. Defense counsel's argument, in effect, made the exact point defendant now claims should have been made – that there were no other calls or messages from Mike for an extended period of time. Defense counsel also brought out that law enforcement officials did not investigate Mike or the messages from Mike. Defense counsel could have concluded as a matter of strategy that these points were sufficiently made for defendant and that the introduction of defendant's phone records into evidence was not necessary. Defendant has not alleged facts that would overcome the presumption of sound trial strategy in not introducing cell phone records into evidence. Defendant has not shown there is a reasonable probability that the result would

have been different if counsel had introduced cell phone records into evidence.

### B. Failure to call a witness

Defendant contends defense counsel should have called her boyfriend John Mullin as a witness. Defendant attached an affidavit from Mullin to defendant's reply to the government's response to the § 2255 motion. Mullin's affidavit states he was at the trial and was available to testify. He had been dating defendant when she was arrested. Mullin states defendant has a long history of drug abuse. He sent her a text message on May 23, 2010, asking defendant to consider giving up their drug use so they could make a life together. Mullin states defendant had a drug problem, but she has never been a drug dealer.

Defense counsel filed a motion in limine seeking to exclude Mullin's text message of May 23, 2010 (doc. 77). Also, defense counsel was aware that defendant admitted to pretrial services that she used methamphetamine (doc. 113 at 19). Mullin was on defense counsel's first amended witness list (doc. 75). However, the government did not present any evidence that defendant used drugs. Thus, it would have been reasonable trial strategy for defense counsel to decide not to present evidence that defendant used drugs. Instead, the defense focused on challenging the primary factors relied upon by the government to connect defendant to the drugs in the truck based on defendant's conduct at the scene – nervousness and the inconsistency and implausibility of the information defendant and Wasyl relayed to the trooper at the scene regarding the nature of their trip. Defendant has not overcome the presumption of sound trial strategy by defense counsel in not calling Mullin as a witness. Defendant has not shown there is a reasonable probability that the result of the case would have been different if counsel called Mullin as a witness.

### C. Failure to seek dismissal of biased jurors

Defendant contends the jury included three people who, during voir dire, said they would consider the defendants' failure to testify as an admission of guilt. A review of the voir dire shows that of the potential jurors who indicated they had problems with a defendant's failure to testify, none served on the jury. Counsel's performance was not deficient for failure to object to any of the selected jurors as biased due to beliefs about a defendant's failure to testify, because none of the jurors actually selected for the jury stated any such bias. For that same reason, defendant has not shown she was prejudiced in that regard.

### D. Failure to object to sleeping juror

Defendant contends she brought to defense counsel's attention that one of the jurors fell asleep during closing arguments, and defense counsel stated that juror had been falling asleep off and on that day. Defendant claims counsel should have sought the dismissal of that juror. Defendant describes the juror's physical appearance, and defendant states the juror said he was a trucker during voir dire.

The only juror who indicated during voir dire some connection to a trucking business did not serve on the jury (doc. 115 at p. 50). Defendant does not point out what, if any, testimony the juror is alleged to have slept through. Defendant has not shown she was prejudiced by defense counsel's failure to bring this matter to the Court's attention. *See United States v. Olivas*, 426 F. App'x 344, 346 (5th Cir. 2011) (no showing of prejudice from juror sleeping during closing argument where there was no evidence the juror slept through the presentation of evidence or the court's instructions to the jury).

### E. Failure to investigate and present evidence that defendant stopped twice at casinos

Defendant contends defense counsel should have investigated and introduced into evidence membership cards from a casino in Arizona and a casino in New Mexico. Defendant asserts that evidence would have rebutted the government's theory that she traveled from Arizona to Oklahoma with no intention of stopping along the way.

Trooper Dollar testified that the abundant amount of food and drink in the truck showed defendant and Wasyl were not interested in stopping for food or drink along the way. On cross-examination by defendant's attorney, Trooper Dollar testified that dry mouth is a possible side effect of medication. On cross-examination, Trooper Dollar testified that the number of drinks and empty drink containers were consistent with someone being thirsty. Dollar also testified on cross-examination there was a document in the car regarding emergency numbers related to diabetes, which suggested someone in the truck was diabetic. The defense attorneys presented evidence of reasons for having abundant refreshments in the truck other than that defendant and Wasyl did not intend to stop for food or drink.

Additionally, Daniel Baldwin, a Drug Enforcement Administration special agent, testified on cross-examination there were some casino cards in defendant's and Wasyl's property. Agent Baldwin said he would not be surprised if they were at a casino before coming to Texas.

Defendant has not shown deficient performance or prejudice. She has not shown the result of the trial would have been different if counsel presented evidence of casino membership cards.

V.

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

A. Failure to timely send government's brief to defendant
and failure to respond to government's brief

Defendant contends she received on December 23, 2011, from appellate counsel, a copy of the government's appellate brief that was filed October 27, 2011. Defendant contends counsel should have brought out in a response brief that there was incorrect evidence about the direction defendant was traveling and about defendant's plans to return to Phoenix and that information about those matters changed from grand jury testimony, to trial testimony, to the government's briefing on appeal.

Defendant's point of error on appeal concerned the admission into evidence of the text messages from Mike to defendant. Defendant has not shown that any evidence about the direction traveled or about her plans to return to Phoenix was relevant to the issue raised on appeal. Defendant has not shown deficient performance, and she has not shown prejudice.

B. Failure to advise defendant of availability of certiorari review

Defendant also asserts she called appellate counsel on September 10, 2012, for an update on the appeal. Counsel told her the case had been affirmed on appeal on June 21, 2012. Defendant has presented a letter from appellate counsel dated September 10, 2012, which defendant states contains the same information provided over the phone. According to the letter, counsel sent defendant a letter earlier in the summer. The letter states counsel previously told defendant about review in the Supreme Court. The letter states the deadline for filing a petition for writ of certiorari was September 19, 2012. Defendant states she received the letter on September 17, 2012. The letter states that defendant's case does not present a viable issue for

Supreme Court review and that defendant was advised to consider filing a § 2255 motion.

The Fifth Circuit Plan for Representation on Appeal Under the Criminal Justice Act ("CJA Plan"), § 6, ¶ 4, provides that "[p]romptly after the court of appeals' decision issues, appointed counsel must advise the client in writing of the right to seek further review by filing a petition for writ of certiorari with the United States Supreme Court." The Fifth Circuit has granted § 2255 relief on claims that appellate counsel failed to advise a defendant of the availability of certiorari review. *United States v. Johnson*, 308 F. App'x 768, 769 (5th Cir. 2009).

According to the letter dated September 10, 2012, from appellate counsel, which defendant has submitted as evidence, counsel previously sent defendant a letter earlier in the summer about the outcome of the appeal. Although the letter apparently did not reach defendant, counsel complied with the required duties under the Fifth Circuit's CJA Plan. Additionally, defendant claims she only had two days in which to file a petition for certiorari after she received counsel's second letter. However, defendant states the same information contained in the letter was provided to her in a phone conversation seven days before she received counsel's second letter. Defendant does not allege she sought an extension of time to file a petition for certiorari petition based on the circumstances of her not having received appellate counsel's first letter. Defendant has not shown she is entitled to § 2255 relief.

## VI.

## DENIAL OF RIGHT TO IMPARTIAL JURY AND FAIR TRIAL

Defendant contends she was denied her Sixth and Fourteenth Amendment rights to an impartial jury and fair trial, because the DEA Agent who testified at trial sat at the prosecutor's

table. The testifying DEA Agent was Daniel Baldwin. Defendant relies on *State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (Kan. 2013), in which the Kansas Supreme Court held that a testifying law enforcement officer is not allowed to sit at the prosecution's table during a jury trial in state court.

In jury voir dire, an Assistant United States Attorney stated Agent Baldwin would be assisting the prosecution. In opening statements to the jury, an Assistant United States Attorney introduced Daniel Baldwin as the case agent. While the record does not show whether Agent Baldwin sat at the government's table at trial, the court will assume he did, and assuming Agent Baldwin sat at the government's table at trial, defendant has not shown her constitutional rights were violated. The rationale of the Kansas case on which she relies was not based on federal constitutional law and it applied only to cases tried in Kansas state courts. In federal court, "Rule 615 of the Federal Rules of Evidence allows the investigative officer in a case to be the government's designated representative to assist the prosecutor at trial, notwithstanding that this officer will also testify at trial as a government witness." *United States v. Robles-Pantoja*, 887 F.2d 1250, 1256-57 (5th Cir. 1989). Thus, there is no error in allowing an agent to testify and sit at the prosecutor's table during trial. *Id.*; *see also United States v. Valencia-Riascos*, 696 F.3d 938, 941-42 (9th Cir. 2012).

VII.

ACTUAL INNOCENCE

Defendant states she is innocent. However, a freestanding claim of actual innocence is not cognizable as a ground for relief. *United States v. Scruggs*, 691 F.3d 660, 671 (5th Cir. 2012); *Matheson v. United States*, 440 F. App'x 420 (5th Cir. 2011).

VIII.

## SENTENCING GUIDELINES

Defendant contends the Court treated the Sentencing Guidelines as mandatory in violation of *United States v. Booker*, 543 U.S. 220 (2005). The Sentencing Guidelines provided for a range of punishment between 121 months and 151 months in prison for each count. The Court did not treat the Sentencing Guidelines as mandatory, and the Court sentenced defendant below the range of the Sentencing Guidelines. The Court assessed concurrent sentences of 120 months of imprisonment, which was the mandatory minimum sentence under 21 U.S.C. § 841(a)(1) and (b)(1)(A). The Court noted at sentencing that the 120-month sentences were the least that could be assessed under the statute. Defendant has not shown the Court treated the Sentencing Guidelines as mandatory, and she has not shown she is entitled to relief on that basis.

IX.

## UNJUST, GROSSLY UNFAIR, AND DISPROPORTIONATE SENTENCE

Defendant contends her sentences were unjust, grossly unfair, and disproportionate to the offense. "The Eighth Amendment precludes the imposition of sentences that are greatly disproportionate to the offenses because such sentences are cruel and unusual." *United States v. Mosquera-Valois*, 592 F. App'x 320, 321 (5th Cir. 2015). In determining whether a sentence is unconstitutionally disproportionate in violation of the Eighth Amendment, courts initially make a threshold comparison of the gravity of the offense against the severity of the sentence. Only if the court determines that the sentence is grossly disproportionate to the offense will the court engage in any further analysis. *United States v. Montes*, 553 F. App'x 449, 450 (5th Cir. 2014) (citing *United States v. Thomas*, 627 F.3d 146, 160 (5th Cir.2010)). The Sentencing Guidelines

are a "convincing objective indicator of proportionality." *United States v. Montes*, 553 F. App'x at 450 (quoting *United States v. Cardenas–Alvarez*, 987 F.2d 1129, 1134 (5th Cir.1993)). Because defendant's sentence was below the Sentencing Guidelines range, it was not grossly disproportionate to her offenses. *See United States v. Montes*, 553 F. App'x at 450 (sentence within the Sentencing Guidelines range is not grossly disproportionate to the offense). Defendant has not shown her sentences violated the Eighth Amendment.

## X.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody filed by defendant CYNTHIA LYNN ORTEGA, should be DENIED.

## XI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 14th day of October, 2015.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

### * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. In

the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).